ERBER v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. June 2, 1916.)

No. 262.

1. CRIMINAL LAW ☞510—EVIDENCE—ACCOMPLICE'S TESTIMONY.
   In the federal courts a conviction may be had on the testimony of an accomplice without corroboration.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1124–1126; Dec. Dig. ☞510.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CRIMINAL LAW ⬤⟿1056(1)—APPEAL—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—NECESSITY.

Where no exception is taken, the propriety of instructions cannot be reviewed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2668, 2670; Dec. Dig. ⬤⟿1056(1).]

3. CONSPIRACY ⬤⟿45—PROSECUTION—EVIDENCE—ADMISSIBILITY.

It was charged that defendant, with others, entered into a conspiracy to purchase goods on credit through a fictitious company, dispose of them, and retain the proceeds, without making any payment, and that to effect their scheme defendant and his co-conspirators gave themselves and corporations in which they were interested as references for the fictitious purchaser, answered the references, recommending credit, acquired the goods, and disposed of them without payment. The mails were shown to have been used in carrying on these frauds. Defendant was conducting a business under the name of the Photo Play Coupon Corporation, and in connection with that business purchased goods from dealers who sold to the fictitious company. One of the conspirators testified that letters to their dupes were sent out every week, and that defendant was a party thereto. *Held*, that correspondence between defendant and those from whom he and the fictitious company purchased was admissible to show that he knew of their existence, but it was improper in such case to show that defendant had not paid for goods which he purchased for himself.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 100–104; Dec. Dig. ⬤⟿45.]

4. CRIMINAL LAW ⬤⟿424(1)—EVIDENCE—ADMISSIBILITY—CONSPIRATORS.

In a prosecution for conspiracy, in which the mails were used in connection with the scheme to defraud, declarations made by one of the conspirators, implicating defendant at a time when the conspiracy had ended, two of the conspirators being in jail and declarant being under subpœna to appear before the grand jury, were inadmissible as against defendant, and letters identified by such declarant should not be received.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1002, 1006, 1008, 1010; Dec. Dig. ⬤⟿424(1).]

Hough, District Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Emil Erber was convicted under Criminal Code (Act March 4, 1909, c. 321) §§ 37, 215, 35 Stat. 1096, 1130 (Comp. St. 1913, §§ 10201, 10385), of conspiracy, and of using the mails in connection with a scheme to defraud, and he brings error. Reversed and remanded.

This cause comes here on a writ of error to review a judgment convicting plaintiff in error (hereafter called Erber or defendant) on four counts of an indictment; three charging violation of section 215, and one charging violation of section 37, of the United States Criminal Code.

C. H. Griffiths, of New York City, for plaintiff in error.

H. Snowden Marshall, U. S. Atty., and F. M. Roosa, Asst. U. S. Atty., both of New York City.

Before COXE, Circuit Judge, and HOUGH and MAYER, District Judges.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MAYER, District Judge.   Defendant was tried on an indictment containing five counts; four of which charged a violation of section 215, and one of section 37 of the Criminal Code of the United States. Defendant was indicted jointly with seven other persons, viz., Zipper, Stavsky, Starr, Mandelbaum, Nadelman (alias Nadel), Shapiro, and Wetstein.   Starr and Shapiro were never apprehended.   Mandelbaum, Nadelman, and Wetstein pleaded guilty the day the trial began, and were witnesses for the United States, and as to them sentence was suspended.   Erber, Zipper, and Stavsky were tried.   The first count was taken from the jury, and on the remaining four counts the jury found Zipper and Stavsky not guilty, and Erber guilty, and thereafter the court sentenced Erber to serve a term of imprisonment.

The first four counts of the indictment are the same, except that a different letter is alleged to have been mailed or received in each of the separate counts.   These counts charge, in brief, that the defendants formed a scheme to defraud and for obtaining merchandise, by means of false and fraudulent pretenses, representations, and promises, from various concerns by organizing a business to be known as the Manhattan Merchandise Company, and in the name of that company to secure merchandise on credit.   It is alleged as part of this plan that various persons and companies were given as references who would give satisfactory references regarding their prior transactions with the Manhattan Merchandise Company, even though they had no such transactions; and it is further alleged that the defendants did not intend to pay for the goods received, but intended to sell them and convert the moneys received therefor to their own use and benefit.   The fifth count of the indictment charges that each of the defendants entered into a conspiracy to devise the scheme described in the other counts of the indictment.

The testimony offered by the United States showed that the idea of starting a company was first talked over between Starr, Shapiro, Nadelman, and Wetstein.   Starr, Shapiro, and Nadelman previously had been associated together in a scheme to start and carry on a business known as the Pan-American Supply Company.   Nadelman had filed the certificate required under the New York statute to conduct a business under the designation of a "company."   A false financial statement was to be made to the commercial agencies to procure credit and such a statement was made by Nadelman, but the scheme was not successful, and Wetstein, a friend of Nadelman's, went into this business, and Nadelman, as he says, "got out."   Wetstein took the name of Excelsior Manufacturing Company.

Nadelman testified that, a few days before he met Erber, he had a talk with Starr and Shapiro about starting another business, and Wetstein also testified to a conversation at the Excelsior Company office with Starr and Nadelman, at which Shapiro was present.   From this conversation it appeared that Nadelman was to open a store and pay the first month's rent, that one Kohler, who knew "how to run such a business," and "a party up in Forty-Second street" were to pay further expenses, that fifty per cent. of the profits were to go to Nadelman, Starr, Shapiro, and Wetstein, and 50 per cent. to "Forty-Second Street."

Kohler, who, according to the evidence, was the deviser of the scheme, or, in any event, an important participator, was not indicted, and was not called as a witness, although during the trial he was presumably in the jurisdiction, and, as the prosecuting attorney swore on cross-examination "available at any time," and at large on a suspended sentence after conviction of some previous offense in the District Court for the Southern District of New York.

Erber was conducting a business of his own at the Long Acre Building on Broadway near Forty-Second street, known as the Photo Play Coupon Corporation and the United Coupon Corporation. This business consisted in selling trading stamps and coupons to merchants who gave these tokens to their customers to induce the public to trade at certain stores. So far as the record discloses this business of Erber was a lawful enterprise and some months before the transactions here referred to, Erber had sued Kohler in the State Court (presumably the New York Supreme Court), and had obtained an injunction against Kohler or his company, which was conducting a rival business. What the controversy was does not clearly appear, and in any event is here immaterial.

In this way (according to Erber), and later through a broker, who brought Kohler to Erber on a proposition to take over Kohler's coupon business, Erber became acquainted with Kohler, with the result that Kohler ultimately took desk room in Erber's office. After Erber became acquainted with Kohler, Mandelbaum, who was Kohler's nephew, worked for Erber getting orders for the Photo Play Company. He had known Starr for several years. There is no testimony that Erber ever saw Zipper or Stavsky.

Without setting forth at length the details of their testimony and its indefinite character in some respects, the three accomplices, Nadelman, Wetstein, and Mandelbaum, testified in effect that Kohler, Wetstein, Nadelman, Starr, Shapiro, and Erber, at Erber's office, devised the scheme whereby Nadelman, under the name of Nadel, was to file a certificate in the New York county clerk's office under the name of Manhattan Merchandise Company, and order goods for which they would not pay, giving as credit references Wetstein's Excelsior Manufacturing Company, Zipper Bros. of which concern defendant Zipper was a member, and New York Credit House, of which Stavsky was proprietor. Wetstein, Zipper, and Stavsky were to answer these references favorably, to the effect that they had dealt with Manhattan Merchandise Company and that the company had good credit up to certain amounts. The profits were to be divided half and half, as stated supra, the "Forty-Second street" group being Kohler, Mandelbaum, and Erber.

Nadelman filed the certificate, opened a store, goods were ordered, and references given and answered as per scheme. The goods were not paid for, but were sold at sacrifice prices and the proceeds appropriated. Nadelman testified that he signed letters which were drawn up by Erber at night, and the two other accomplices testified, though unable to give specific instances, that Erber had answered references and written letters. The nearest approach to any proof that Erber

mailed any letters was Mandelbaum's statement referring to letters generally, "They were mailed out. I also mailed some. Two or three times a week I guess they were mailed." There was no evidence that Erber ever received any money and Mandelbaum said:

"I never gave Mr. Erber any money. I never saw any one give Mr. Erber any money."

[1] Nowhere in the record is there a scintilla of evidence corroborating the testimony of the three accomplices against Erber, except, possibly, in regard to the Pocket Umbrella Company, hereinafter mentioned. Such corroboration is not necessary in the United States courts, although frequently required by state statutes; but the absence of corroboration gives emphasis to the errors which we think compel a reversal of the judgment of conviction in a case where the attitude of the accomplices is vividly portrayed by Nadelman's answer on cross-examination, "I am trying now to save myself from further imprisonment."

Erber took the stand, and denied every essential element of the testimony adduced by the government, admitting, however, that some 17 years prior to his trial, when a youth of 17 or 18, he had pleaded guilty to some charge of embezzlement in connection with his employment as a post office clerk and consequently had served a sentence in a reformatory.

With this sharp conflict as to the facts and this uncorroborated testimony, the case—and properly so—went to the jury. After retiring, "the jury," as the record states, "returned into court and stated that they were unable to agree; that they stood six to six. They asked for further instructions." We are not enlightened as to what the request of the jury was, but from the additional instructions of the trial court, it is apparent that further light was sought as to the weight to be accorded to the testimony of accomplices.

[2] As no exception was taken to the additional instructions, they cannot be reviewed, but the incident is mentioned because affirmance is urged by the government on the ground that the error infra largely relied on by defendant was "merely a fact to be considered with the other evidence in the case," and that "it is not believed that there can be a question of a doubt as to Erber's guilt."

Of the numerous amended assignments of error, we think that consideration of the group relating to the Photo Play Company and of the admission of the letters referred to in assignment No. 16 will be sufficient.

[3] 1. One of the firms from which Manhattan Merchandise Company had ordered and not paid for goods was the Pocket Umbrella Company of Findley, Ohio. After the witness Hyan, manager of the Pocket Umbrella Company factory, had testified as to transactions with the Manhattan Merchandise Company, the following occurred:

"Q. I show you Government's Exhibits 37, 38, 39, and 40. Can you tell me what those exhibits are?

"Mr. Jordan: I object. They state for themselves, if your honor please.

"The Court: He may answer, if he can identify them, whether he ever saw them before; what they are.

234 F.—15

"Mr. Jordan: Exception.

"A. This is correspondence or letters received by the Pocket Umbrella Company from the Photoplay Coupon Company of New York, an order for umbrellas, and the answer.

"Mr. Jordan: I move that * * * all the answer be stricken out as incompetent, irrelevant, and immaterial, not embraced within the issues in this case.

"The Court: Who is this communication to?

"Mr. Roosa: From the Photoplay Coupon Company, where Nadelman testifies that these letters were written. I offer them in evidence to show that Erber himself was communicating with these people at the same time he was communicating under the name of the Manhattan Merchandise Company, and that he got goods, and did not pay for them.

"Mr. Jordan: * * * I submit that it can have no bearing upon the issues involved in this case.

"The Court: Doesn't it lead up to or introduce any correspondence between them and the Manhattan Merchandise Company?

"Mr. Jordan: Not the slightest. Here was a corporation doing business, and the corporation is doing business now.

"The Court: What is the purpose of this.

"Mr. Roosa: I want to show Erber's knowledge of these particular companies the Manhattan Merchandise Company was doing business with. Here are some letters written to the Pocket Umbrella Company. Nadelman testifies that Erber wrote the letters and signed them. Now here we have the Photoplay Coupon Company, letter signed by Erber, corresponding with this same company, and getting goods on credit, for which he does not pay.

"The Court: Are you going to show any connection? These are entirely different transactions. I don't know any reason why Erber should not do business with them.

"Mr. Roosa: I simply want this correspondence identified.

"The Court: If that is all, I will overrule the objection.

"Mr. Jordan: I object to his getting this before the jury. I respectfully except.

"This Government's Exhibit 39 was a letter we received from the Photoplay Coupon Company, and this is a copy of our reply and Government's Exhibit 37 is a copy of the letter received, 38 a copy of our reply; in other words the correspondence that passed between us.

"The Court: These are merely introduced for identification.

"Mr. Roosa: For identification at the present time.

"Q. Did you ship any goods to the Photoplay Coupon Corporation?

"Mr. Jordan: That I object to as incompetent, irrelevant and immaterial.

"The Court: I will overrule the objection, and you may have your exception. I assume that counsel will connect it.

"Mr. Jordan: He cannot connect it.

"The Court: That remains to be seen. If he does not you may move to strike it out. This is a conspiracy case, and conspiracies may be shown by circumstances and detached instances which, if taken all together, point beyond a reasonable doubt to the corpus delicti; why, it is competent testimony, the court can never anticipate what effect an isolated fact or circumstances might have, when considered with all the other evidence in the case.

"Mr. Jordan: I except to the ruling.

"The Court: Very well.

"Q. (Last question read) A. Yes, sir. Q. What was the value of the goods?

"Mr. Jordan: Objected to as before.

"The Court: I will overrule the objection.

"Mr. Jordan: Exception.

"A. I think about $250 worth.

"Q. Did you get paid for those? A. No, sir.

"Mr. Jordan: Objected to upon the same ground. Overruled. Exception.

"Q. You say no, sir. A. No, sir."

Later the witness Taylor, after testifying to transactions of the Economy Manufacturing Company of Philadelphia with the Manhat-

tan Merchandise Company, stated in answer to a question of the prosecuting attorney:

"Exhibits 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, and 65 is correspondence from the Photoplay Coupon Corporation and carbon copies of our replies to them."

Thereupon the record continues:

"Q. Did you ship them any goods?
"Mr. Jordan: That I object to as immaterial, irrelevant, and incompetent.
"The Court: Do you purpose to connect it up with any one to make it relevant to this issue?
"Mr. Roosa: It is the same thing we had before in regard to the Pocket Umbrella Company, to show that Erber was communicating at just about the same time with the same companies the Manhattan Merchandise Company was communicating with and in the same office.
"By the Court: Q. Was that correspondence conducted in the same way? And the letters sent by mail? A. Yes sir; I personally attended to the receipt of the correspondence and know it came through the mail.
"The Court: I will overrule the objection.
"Mr. Jordan: I respectfully except.
"By Mr. Roosa: Q. Did you ship any goods to them? A. Just a line of samples. They ordered other goods."

The exhibits referred to were not offered nor received in evidence, although in the presence of the jury the statement supra was made, "Now, here we have the Photo Play Coupon Company letter signed by Erber, corresponding with this same company, and getting goods on credit for which he does not pay." At the conclusion of the government's case, counsel duly moved to strike out all this testimony of Hyan and Taylor, which motion was denied, and exception taken.

"In so far as the testimony showed that Erber knew of the existence of the Pocket Umbrella Company and the Economy Manufacturing Company, as evidenced by the fact that he had corresponded with them, it was admissible for the reason that such testimony was some evidence to corroborate the testimony of Nadelman as to the writing of letters to the same concerns with which Manhattan Merchandise Company had dealt. But the testimony as to nonpayment to the Pocket Umbrella Company and the shipment by the Economy Manufacturing Company was entirely irrelevant. In the one case the fact that the goods were not paid for was plain, and in the other the purpose and effect were clearly to create a like inference. As the trial court truly said:

"We are not suing on an open account. We are not trying to establish a debt."

The result of the testimony was to produce an atmosphere unfavorable to defendant because he had not paid his debts, and its admission was error within the principle referred to in the Baron transaction in Scheinberg v. United States, 213 Fed. 757, 130 C. C. A. 271, Ann. Cas. 1914D, 1258. On the evidence there was a complete failure to show any unlawful scheme devised by Erber in connection with his Photo Play Coupon Company, and so the prosecution in its brief admits when, referring to Marshall v. United States, 197 Fed. 513, 117 C. C. A. 65, it states:

"In the Marshall Case evidence of a separate contemporaneous fraudulent scheme was introduced; in this case only one isolated fact which would pos-

sibly be objected to was introduced, namely, that the goods received by the Photo Play Coupon Company from the Pocket Umbrella Company had not been paid for; not a separate scheme, and not even a criminal offense, but merely a fact to be considered in connection with the other evidence in the case."

Whatever may be the view of the courts as to the occasion when and the extent to which testimony as to similar transactions are admissible (and this court has expressed its views as to this statute in the Marshall Case, supra), the transaction must always be similar or substantially so. Mayer v. People, 80 N. Y. 364; People v. Shulman, 80 N. Y. 373, note; United States v. Budd, 144 U. S. at page 164, 12 Sup. Ct. 575, 36 L. Ed. 384; People v. Thompson, 212 N. Y. at page 251, 106 N. E. 78, L. R. A. 1915D, 236, Ann. Cas. 1915D, 162; Fish v. United States, 215 Fed. at page 551, 132 C. C. A. 132, L. R. A. 1915A, 809; People v. Marrin, 205 N. Y. 281, 98 N. E. 474, 43 L. R. A. (N. S.) 754; Boyd v. United States, 142 U. S. at page 457, 12 Sup. Ct. 292, 35 L. Ed. 1077.

[4] 2. At the conclusion of the cross-examination of Zipper, the government offered in evidence seven letters written by merchants to the New York Credit House, asking for information as to the credit of Manhattan Merchandise Company, and containing answers to these inquiries, signed New York Credit House, but not satisfactorily proved. The court excluded these letters. Thereupon the prosecuting attorney took the stand and testified to a conversation with Stavsky. Stavsky had testified that he had refused to answer these letters in response to Starr's insistence. In the conversation with the prosecuting attorney there was no statement by Stavsky that he signed these letters.

"I asked him" testified the prosecuting attorney, "concerning the references, and he made no denial that he had assigned these references. * * * I will not say he said he did not or did receive them, and the reason was that I took it for granted."

The contention of the government is somewhat novel. This speculation is indulged in:

"Since the request for references were in fact answered, as shown by the testimony of the witnesses receiving them, it is plain to be seen what probably happened, if Stavsky's testimony is true—namely, that upon Stavsky's refusal to answer the request for references, they were answered by Starr or Erber, in the same manner as Wetstein testified was done in the case of requests received by his company."

At the time when this conversation took place, Nadelman and Wetstein had been arrested and were in the City Prison, and a grand jury subpœna had been sent to Stavsky who, being ill, had not responded and then the prosecuting attorney, with a post office inspector, visited Stavsky's home and held the conversation above referred to. The alleged conspiracy manifestly was at an end, and admissions or confessions by Stavsky then under subpœna to appear before the grand jury, were clearly not admissible against his alleged co-conspirators.[1]

1 NOTE.—The recent case of Stager v. U. S., 233 Fed. 510, —— C. C. A. ——, while not in point as to the facts, is a useful reference as to declarations of conspirators.

Nevertheless, at the urgent solicitation of the government and over objection, the seven letters were admitted against Erber and exception was taken.

We are of opinion that the admission of these letters was error, and, as we cannot say upon this record that this evidence and that relating to the Photo Play Coupon Company was not prejudicial, the judgment is reversed.

HOUGH, District Judge, dissents.